1
2
3
4
5
6
7
8
9
10
11

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

12  DEWAYNE McGEE RICHARDSON,      )      1:04-CV-5349 LJO HC
                                  )
13              Petitioner,       )      ORDER DENYING PETITION FOR WRIT
                                  )      OF HABEAS CORPUS
14        v.                      )      [Doc. #1]
                                  )
15  D. L. RUNNELS, Warden,        )      ORDER DIRECTING CLERK OF COURT
                                  )      TO ENTER JUDGMENT
16              Respondent.       )
    _____)

17

18        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

19  pursuant to 28 U.S.C. § 2254. Due to the death of Magistrate Judge Hollis G. Best and the

20  appointment of Magistrate Judge William M. Wunderlich, by order dated May 2, 2004, this case was

21  reassigned to the undersigned for all further proceedings. The parties having voluntarily consented to

22  exercise of Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1), by order dated July 9,

23  2004, this case was assigned to the undersigned for all purposes, including entry of final judgment.

                          **PROCEDURAL BACKGROUND**

25        Petitioner is currently in the custody of the California Department of Corrections pursuant to

26  a judgment of the Superior Court of California, County of Kern, following his conviction by jury

27
28

trial on June 27, 2001. (CT[1] 1287-88.) Petitioner was convicted of conspiracy to commit robbery and conspiracy to commit first degree murder in violation of Cal. Penal Code § 182(A)(1)[2]. (CT 1287, 828-31.) The jury found seven of the ten alleged overt acts to be true. (CT 1287-1288.) The jury found true the special allegations that the crime was committed for the benefit of a criminal street gang within the meaning of Section 186.22(b)(1) and that Petitioner had personally discharged a firearm during the offense within the meaning of Section 12022.53(d). (CT 830-31.) Petitioner was further convicted of the premeditated murder of Daryl McCoy in violation of Section 187(a). (CT 831.) The jury found true the special allegations that the murder was committed during the commission of a robbery within the meaning of Section 190.2(a)(17)(A). (CT 831.)

On September 25, 2001, the trial court struck the Section 12022.53(d) special allegation. (CT 1576.) The trial court then sentenced Petitioner to a five year term for the conspiracy plus a five year term for the gang enhancement for a total of ten years on the first count. (CT 1577.) Petitioner was then sentenced to life imprisonment without the possibility of parole on the murder count. (CT 1577.) The terms were ordered to be served concurrently. (CT 1577.)

Thereafter, Petitioner filed a notice of appeal with the California Court of Appeal, Fifth Appellate District (hereinafter "5th DCA"). On October 14, 2003, the 5th DCA issued an unpublished opinion affirming the judgment in all respects with the exception of the correction of a restitution fine. See Exhibit A, Respondent's Answer to the Petition (hereinafter "Response").

Petitioner then filed a petition for review in the California Supreme Court, and on January 22, 2004, the petition was summarily denied without comment. See Exhibit B, Response.

On February 23, 2004, Petitioner filed the instant federal habeas petition in the United States District Court for the Eastern District of California, Sacramento Division. By order of the Court dated February 26, 2004, the petition was transferred to the Fresno Division. Petitioner raises the following six grounds for relief: (1) "[Petitioner] was denied equal protection and due process by the denial of the Wheeler/Batson motion, purportedly because the prospective juror was not aware of

---

[1]"CT" refers to the Clerk's Transcript on Appeal which Respondent has lodged with the Court.

[2]All further references will be to the California Penal Code unless specifically noted.

1  gang activity in south Bakersfield, and was therefore presumably naïve"; (2) "There was a lack of

2  evidence of provocative act murder, because there was a lack of evidence that either of the surviving

3  perpetrators fired into the motel room"; (3) "The trial court erred by failing to instruct on proximate

4  cause as an aspect of provocative act murder"; (4) "The robbery special circumstances may not be

5  constitutionally applied to a conviction based on provocative act murder as opposed to felony

6  murder"; (5) "The photographic identification provided by prosecution witness Bobby Smith was the

7  result of an impermissibly suggestive police procedure"; and (6) "Conspiracy does not exist as an

8  independent theory of criminal liability in California, and the trial court erred by instructing that

9  conviction could be reached under that theory."

10      On June 24, 2004, Respondent filed an answer to the petition. On July 19, 2004, Petitioner

11  filed a traverse.

12                                    **FACTUAL BACKGROUND**

13      The Court hereby adopts the facts as summarized by the 5th DCA in its opinion dated

14  October 14, 2003:

15          Murder victim Darryl McCoy, Jr., (DJ)[3] "hung out" with defendant Richardson and
        knew defendant Taylor. McCoy's mother, Shawna Gooden, used crack cocaine. From
16      October to December of 2000 she sometimes purchased her drugs from Kendall McDaniel
        (Pookie) at the Desert Star Motel. Gooden also had a relationship with Calvin Makes (Aces),
17      a friend of McDaniel.

18          On the evening of December 5, 2000, Aaron Gooden (McCoy's uncle and Shawna's
        brother) was staying with Shawna in her home. McCoy, Taylor and Richardson arrived at
19      Shawna's home at approximately 10 or 11 p.m. on the evening of December 5, 2000. On this
        night, Shawna heard McCoy talk with Richardson about robbing McDaniel in his room at the
20      Desert Star. Richardson suggested that McCoy ask Shawna if McDaniel and his friends had
        guns and/or money. Shawna told McCoy not to ask her anything.
21
            McCoy, Taylor and Richardson conversed that evening with Aaron. They asked him
22      what was happening on "U Block" (Union Street) and inquired if there was any "money
        rollin' through there." Aaron told the three "nobody got it going on down there." Taylor
23      disagreed with Aaron's assessment of the situation and insisted that McDaniel and others had
        a lot of money. Taylor continued to encourage the group to go to the Desert Star to rob
24      McDaniel and others. Aaron insisted that the occupants of the motel did not have any money.
        McCoy, Richardson and Taylor agreed to a plan to go to the motel and rob McDaniel and
25      others. Aaron testified that Richardson always carried a gun with him and that Taylor was

26

27

28      _____

        [3]The 5th DCA's recital of facts includes the nicknames of several of the individuals involved.

1   carrying a small gun with a clip the night of the murder.[4]

2       McCoy, Taylor and Richardson left in a dark-colored Ford Blazer. Taylor was
3   driving.

        In December of 2000, McDaniel had been living in room 4 of the Desert Star motel
4   for two or three months. His sister Crystal lived in room 3 with their mother, Darlene Lewis.
5   Crystal's boyfriend was Brian Calhoun (Rifle). Bobby Smith (G Bob) lived in room 12.

        On the evening of December 5, 2000, McDaniel, Tyrone James (Rone), and Shavon
6   Smith (V) were in room 4 drinking, smoking marijuana, and watching television. Calhoun
7   was in and out of room 4 that evening.

        G Bob saw McCoy outside of G Bob's room before 1 a.m. on December 6, 2000. He
8   was with two other individuals that G Bob did not know. McCoy was wearing a light-colored
9   sweatshirt. The three individuals came into his room. G Bob asked McCoy if he would sell
    him some crack cocaine. McCoy said he was not there to sell crack. G Bob asked McCoy if
10  he wanted to pay for a prostitute. McCoy replied no. The group was in his room for three to
    five minutes and then G Bob asked them to leave. G Bob left also.

11      G Bob testified that he had seen a gun lying on a table in room 4 on more than one
12  occasion. He was in room 4 hours before the shooting and he saw the gun in the room on a
    table. At trial, G Bob said he did not see Taylor, Richardson, or McCoy with a gun. When G
13  Bob was interviewed soon after the shooting, he told Detective Adair that one of the three
    men pulled out a gun as the men walked toward room 4. G Bob identified Richardson as the
14  individual with the gun. At trial, he testified that he never saw anyone pull out a gun.

15      At the time when McCoy was visiting with G Bob, Calvin Makes (Ace) arrived at the
    Desert Star Motel to pick up McDaniel. He noticed three or four men wearing dark clothing
16  by room 12. He got "bad vibes" from them and thought they looked like they were getting
    "geared up" for something. Makes knocked on the door of room 4. McDaniel answered the
17  door, and Makes told him to grab his stuff so they could get out of there because there were
    men nearby who looked suspicious. Makes headed towards his car to wait for McDaniel.
18  McDaniel shut the door and stayed in the room to gather up some of his things. Someone
    called the room and told McDaniel that some suspicious men in the parking lot were going to
19  do something.

20      McDaniel opened the door and saw "the silver guns" and then he saw "gun flashes."
    McDaniel tried to close the door. He ran to the bathroom. He heard 12 or 13 more shots and
21  then left through the bathroom window. McDaniel told officers that the person who shot him
    wore a ski mask or a hood.

22      V testified that 10 minutes after someone came to their door and warned them that
23  there were suspicious people outside, someone came in the room shooting. V was on the bed
    half asleep when the shooting started; he fell to the side of the bed. One person came into the
24  room shooting and another person started shooting from outside of the room. After a few
    minutes the shooting stopped and V went out the bathroom window.

25      When interviewed by Detective Adair, V stated that after they had been warned that
26  something was going to occur he looked out of the room. He saw G Bob and three others
    approach the room. G Bob continued walking away from the room but the other three

27

28  [4]When initially questioned, Aaron denied knowing anything. At the preliminary hearing he testified that he did not
    see any weapons. Aaron was in the witness protection program prior to and at the time of trial.

stopped. Two of the males were wearing dark clothing and a third was wearing light-colored clothing. He said that one in dark clothing entered the room shooting and another in dark clothing stayed in the area of the open door and was shooting into the room. He did not see the person in the light-colored clothing in the room or shooting.

James testified that he was asleep before the shooting. He dropped to the floor and stayed there until the shooting stopped.  He then left out the bathroom window. Because he was on the floor he did not see anything.

McDaniel, V, and James all testified that they did not have a gun in the room and they were not selling drugs from the room. They denied being members of the Country Boy Crips.

Calhoun testified that he was in room 3 with McDaniel's sister when he heard gunshots. He did not look out the window and did not see anyone. He got down on the floor beside the bed and eventually jumped out the bathroom window. He said he saw someone outside the window in room 3 wearing a light-colored sweatshirt, leaning forward and twisting and shooting a handgun into room 4. It looked like this person got shot and fell to the ground.

Warren Murrow was living at the Desert Star motel in room 15. He heard shots in the early morning hours of December 6, 2000. He called 911 but did not look out his window. When he did look out his window, he saw two people picking up a body and putting it into a dark-colored sports utility vehicle.

Police officers arrived at the Desert Star motel. McDaniel had been shot. He was transported to the hospital. McDaniel had a gunshot wound to his upper abdomen. The entry wound was underneath the ribs; the bullet was lodged in the back of his body, just behind his armpit. McDaniel also had a penetrating gunshot wound in his right upper arm and left forearm. Bullets were not recovered from these wounds.

Police Officer Bobby Ray Woolard arrived at the Desert Star Motel. He secured room 4 and then waited outside. He heard a noise inside the room. He reentered the room and found V and James had entered the room from the bathroom window. They were placed into handcuffs and seated in patrol cars.

The police radios were on in the car. Information came over the radio indicating that Tramell Taylor may have been involved in the incident. V said, "Tramell definitely shot Pookie." Officer Woolard saw what looked like drugs in front of room 4.

On December 6, 2000, Raynisha Fite, the mother of Taylor's child, was at the home of her mother, Latonia Weston. Her sister Kandis Naffs was at the home also. Naffs heard a car coming quickly up the street. She heard the car brake and the car doors open. The front door to the house opened and Taylor ran inside. He said his friend had been shot. Weston called 911. Naffs called an ambulance and went outside, as did Fite and Weston. Taylor and Richardson took McCoy out of the Blazer and put him on the grass. Naffs took McCoy's shirt off and tried to stop the bleeding. Taylor was standing over Naffs; shortly thereafter Taylor departed.

Police arrived at Weston's home. An officer asked Richardson for his driver's license. He complied. The officer inquired who had been driving the Blazer. Richardson said Tramell. The officer asked Richardson for the room number of where this incident took place. Richardson commented they were just visiting friends. The officer told Richardson he knew this incident happened at the Desert Star and asked him for the number of the room where the incident occurred. Richardson admitted the incident happened near room 4. The officer went inside looking for Taylor but could not find him. When the officer returned outside,

Richardson was no longer at the scene.

McCoy was transported to the hospital. He died from a single gunshot wound through his heart. The path of the bullet was sharply downward and front to back. It was the pathologist's opinion that McCoy was crouched or in a stooped position when he was shot. McCoy would have been incapacitated in a matter of seconds after being shot. A bullet was retrieved from McCoy's body.

Officer Jeff Cecil seized items from the lawn on Fifth Street. Included in the items were a white tee shirt and a gray fitted sweatshirt. These items had blood on them. There were no bullets or guns in the Blazer on Fifth Street.

A bullet was retrieved from McDaniel during surgery. Numerous nine-millimeter Markahov casings were found in room 4. An expert determined that the bullet from McDaniel and the casings found scattered about in room 4 were fired from the same weapon. Two .38-caliber spent bullets were found in room 4. The bullets recovered from the deceased victim, McCoy was either a .38-caliber or a nine-millimeter. Based on markings on the bullet and casings, the expert determined that the bullet from McCoy's body could not have been fired from the same gun that fired the bullet retrieved from McDaniel or the .38-caliber spent bullets found in room 4. At least three guns were fired during the shooting. In addition, two live .45-caliber shells were located in the parking lot, suggesting the presence of a fourth gun. Also, there were numerous holes in the walls and windows of room 4. Because of the location of the holes, the police did not attempt to recover spent bullets from these areas.

Frank Gonzales, a police officer in the gang suppression unit, testified that Calhoun, V, and James were active members in the Country Boy Crips. McDaniel was not a full-fledged Country Boy Crip but was an affiliate. Taylor, Richardson, and McCoy were members of the West Side Crips. The West Side Crips and the Country Boy Crips were deadly rivals. It was his opinion that the crimes that occurred on December 6, 2000, were gang related and performed with the intent of benefitting the gang.

**Defense**

Witnesses testified regarding the whereabouts of Taylor and Richardson on December 5, 2000. Richardson testified on his own behalf. He claimed his group went to the motel because McCoy wanted to visit G Bob. As they were leaving, shots rang out from room 4. Richardson and Taylor picked up McCoy, put him in the Blazer, and drove to Fifth Street. Richardson was so shaken up by the incident that he left after giving the police officer his identification. He claimed that he did not have a gun, nor did Taylor or McCoy. A private investigator testified that it was his opinion that Richardson was not a gang member.

See pp. 2-8, Exhibit A, Answer.

**DISCUSSION**

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

1   Constitution.  In addition, the conviction challenged arises out of the Kern County Superior Court,

2   which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 2241(d).  Accordingly,

3   the Court has jurisdiction over the action.

4          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

5   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

6   Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114

7   F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert.*

8   *denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997)

9   (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was

10  filed after the enactment of the AEDPA; thus, it is governed by its provisions.

11  **II.  Legal Standard of Review**

12         This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

13  pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

14  Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

15         The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

16  Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70

17  (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the

18  adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

19  application of, clearly established Federal law, as determined by the Supreme Court of the United

20  States" or "resulted in a decision that was based on an unreasonable determination of the facts in

21  light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

22  538 U.S. at 70-71; see Williams, 529 U.S. at 413.

23         As a threshold matter, this Court must "first decide what constitutes 'clearly established

24  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

25  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

26  must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

27  of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly

28  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

1  the Supreme Court at the time the state court renders its decision." Id.

2      Finally, this Court must consider whether the state court's decision was "contrary to, or

3  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

4  *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

5  writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

6  question of law or if the state court decides a case differently than [the] Court has on a set of

7  materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

8  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

9  court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

10  applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

11      "[A] federal court may not issue the writ simply because the court concludes in its

12  independent judgment that the relevant state court decision applied clearly established federal law

13  erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A

14  federal habeas court making the "unreasonable application" inquiry should ask whether the state

15  court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

16      Petitioner has the burden of establishing that the decision of the state court is contrary to or

17  involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,

18  94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

19  Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

20  decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th

21  Cir.1999).

22      AEDPA requires that we give considerable deference to state court decisions. The state

23  court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's

24  interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537

25  U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

26  **III.  Review of Petitioner's Claims**

27      **A.  Ground One**

28      In his first ground for relief, Petitioner claims the trial court erroneously denied defense

counsel's motion under <u>People v. Wheeler</u>, 22 Cal.3d 258 (1978), and <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), in violation of his due process rights. Petitioner claims the only potential black juror was excused by the prosecutor because of her race.

<u>1.  Factual Background</u>[5]

During voir dire, the prospective jurors were questioned about the area of the city where they lived and whether the jurors had been in any situations involving street gangs. Several of the questions included whether the prospective jurors had seen gang members in person, if they had any contact, specific knowledge or problems with gangs and if anyone was fearful of any areas of the county because of gangs.

Juror No. 21060852 (hereinafter "Juror 52") was in the fifth group of prospective jurors called into the jury box. She stated she was married and had three young children. She worked at a child care center, and her husband worked for a radio station. She lived in south Bakersfield. When questioned further, she revealed that her husband also worked as a barber and his barbershop was located in south Bakersfield. When the prosecutor asked her if there was anything that had come up in questioning so far that concerned her, she replied, "Nothing." When counsel for Petitioner's co-defendant asked if the potential jurors knew anybody or came in contact with anyone who was in a gang, no one, including Juror 52, responded. Petitioner's counsel then asked if there were any Black people in the courtroom, and Juror 52 stated that she was half Black.

The district attorney exercised a peremptory challenge to Juror 52. Immediately thereafter, Petitioner's attorney brought a <u>Wheeler/Batson</u> motion outside the presence of the jury. Defense counsel asked the court to inquire whether it was a proper non-race-based challenge. The court first stated that it could not state with certainty whether any of the remaining prospective jurors might have some African-American background but that Juror 52 was the only individual who had been called to the jury box who is African-American. The court stated that the mere fact that Juror 52 may be the only person called who is African-American was not enough to present a *prima facie* case and invited defense counsel to respond. Defense counsel questioned whether it was necessary for him to

---

[5]These facts are derived from the factual summary in the opinion of the 5th DCA. <u>See</u> pp. 9-11, Exhibit A, Answer.

respond. Counsel for Petitioner's co-defendant joined in the motion and asserted that none of the other members were Black, and he did not see anything in Juror 52's answer that warranted her excusal.

The court noted that Juror 52 appeared to be the only person identified as Black and found a *prima facie* case. The court asked the prosecutor to state his reasons for her excusal. The prosecutor first noted that he did not even recognize her initially as being Black. He stated he was concerned about Juror 52's age. He stated the juror appeared to very young, even though she had three children, and estimated her age to be about 19 or 20 based on her appearance. He stated he was particularly concerned that she was a resident of south Bakersfield, her husband's business was in south Bakersfield, and despite having several opportunities, she declined to say she'd ever had any contact with any gang members of any sort. Based on his understanding of south Bakersfield, the prosecutor found her answers to be either disingenuous or a statement of total naivete.

In denying the motion, the court expressed some concern over the challenge, but found the prosecutor's reasons to be legitimate. Specifically, the prosecutor's concerns over her young age and his belief that she was either very naive or not completely forthcoming were proper considerations. The court did not find the prosecutor's challenge to be based on race or ethnicity.

2.  Clearly Established Supreme Court Law

Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal and state trials is governed by the standard established by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 89 (1986).

In Batson, the United States Supreme Court set out a three-step process in the trial court to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause. Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769 (1995).  First, the defendant must make a *prima facie* showing that the prosecutor has exercised a peremptory challenge on the basis of race. Id. That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race. Id.

If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-neutral explanation for its challenge. Id. At this step, "the issue is the facial validity of the

1   prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation,

2   the reason offered will be deemed race neutral." Hernandez v. New York, 500 U.S. 352, 360, 111

3   S.Ct. 1859  (1991).  Finally, the trial court must determine if the defendant has proven purposeful

4   discrimination.

5           3. Review of Claim by State Courts

6           This claim was first presented on direct appeal to the 5th DCA.  The 5th DCA denied the claim

7   on October 14, 2003, in a reasoned opinion.  See Exhibit A, Answer.  The claim was then presented

8   to the California Supreme Court in a petition for review; however, the petition was summarily

9   denied on January 22, 2004. See Exhibit B, Answer.  The California Supreme Court, by its "silent

10  order" denying review of the 5th DCA's decision, is presumed to have denied the claim presented for

11  the same reasons stated in the opinion of the 5th DCA.  Ylst v. Nunnemaker, 501 U.S. 797, 803

12  (1991).

13          In reviewing Petitioner's claim, the 5th DCA found the trial court's ruling to be supported by

14  the evidence. It was undisputed that Juror 52 appeared very young. No one challenged the

15  prosecutor's estimate that Juror 52 appeared to be 19 or 20 years of age despite having three young

16  children. In addition, the prosecutor's cynical belief that anyone who had lived in south Bakersfield

17  would have had contact with a gang member went unchallenged and appeared to be accepted as true

18  by the court and the defendants. The appellate court also noted it was true that Juror 52 had been

19  asked "point blank" whether she had any knowledge of any gangs but did not respond. Therefore, the

20  appellate court found substantial evidence supported the trial court's denial of the motion.

21          4. Analysis

22          The state court's denial of Petitioner's claim is consistent with Supreme Court precedent.

23  According to Batson, defense counsel must first present a *prima facie* case. Here, the trial court

24  found a *prima facie* case had been made. Under Batson, the burden then shifts to the prosecutor to

25  provide a race-neutral explanation for his challenge. In this case, the prosecutor stated he was

26  concerned that Juror 52 appeared to be very young. In addition, he believed that she was either very

27  naive or not completely forthcoming in her responses. The trial court found counsel's responses to be

28  facially valid and found no discriminatory intent inherent in his explanation. Likewise, this Court

1  finds no discriminatory intent. As noted by the appellate court, the prosecutor presented several

2  adequate race-neutral explanations for the excusal of the potential juror. The prosecutor had valid

3  concerns regarding her age. See Jordan v. Lefevre, 293 F.3d 587, 595 (2d Cir.2002). In addition, the

4  prosecutor's concerns over the juror's possible naivete or insincerity is a legitimate concern which

5  finds support in her responses. No one challenged the prosecutor's belief that someone living in

6  south Bakersfield necessarily would have come in contact with a gangmember. Therefore, Juror 52's

7  failure to respond to the numerous probing questions regarding knowledge of gangs supports the

8  prosecutor's explanations. Petitioner has not demonstrated purposeful discrimination by the

9  prosecutor. The evidence only shows that a potential juror who classified herself as being half

10  African-American was excused for race-neutral reasons.  Thus, the state court rejection of this claim

11  was not contrary to, or an unreasonable application of, clearly established Federal law. See 28 U.S.C.

12  § 2254(d). The claim must be denied.

13  **B.  Ground Two**

14  In his second claim, Petitioner alleges that there was insufficient evidence of provocative act

15  murder because the evidence did not show that either of the two surviving perpetrators fired into the

16  motel room.

17  Two theories of liability for the first degree murder conviction were presented to the jury:

18  felony murder and provocative act murder. Under the felony murder theory, Petitioner could be

19  found guilty of murder if the jury determined that either he or co-defendant Taylor shot and killed

20  McCoy during the course of the attempted robbery. The trial court ruled that the evidence did not

21  support the theory of felony murder.

22  Under the provocative act theory, Petitioner could be found guilty of first degree murder if

23  the jury found that either he or co-defendant Taylor committed a provocative life-threatening act

24  beyond that necessary to commit the robbery. Petitioner argues that the evidence did not show that

25  either he or co-defendant Taylor committed such an act. He points to the fact that the jury found the

26  allegations that Petitioner and co-defendant Taylor personally used a firearm to be not true.

27  This claim was also first presented on direct appeal to the 5th DCA and denied on October 14,

28  2003, in a reasoned opinion. See Exhibit A, Answer. The claim was then presented to the California

1   Supreme Court in a petition for review which was denied on January 22, 2004. See Exhibit B,

2   Answer. The California Supreme Court is presumed to have denied the claim presented for the same

3   reasons stated in the opinion of the 5th DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

4       The 5th DCA first noted that the jury made the following finding as to Petitioner:

5           We, the Jury, empaneled to try the above entitled case, find it to be true as to
    [Petitioner] that he was a principal in a crime in which another principal personally and
6   intentionally discharged a firearm which proximately caused great bodily injury or death to
    another person, not an accomplice, during the commission of the above offense, within the
7   meaning of Penal Code Section 12022.53(d), as alleged in the Information.

8   See p. 22, Exhibit A, Answer.

9       From this finding, the appellate court determined that the jury found that McCoy was the

10  principal who had fired the weapon that caused injury to McDaniel. The appellate court thus

11  assumed that neither co-defendant Taylor nor Petitioner fired the weapon which caused great bodily

12  injury to McDaniel. Notwithstanding this finding, the appellate court found that substantial evidence

13  supported the provocative act theory as to Petitioner. This was because the jury's finding did not

14  void the possibility that Petitioner had fired a weapon into room 4. It merely voided the possibility

15  that Petitioner had fired the weapon that injured McDaniel. Applying the Johnson[6] standard, the

16  court found substantial evidence clearly supported a finding that McCoy and at least one of the other

17  co-defendants, including Petitioner, had fired weapons into room 4. Thus, Petitioner and his co-

18  defendant, having committed a provocative life-threatening act, were properly convicted of first

19  degree murder under the provocative act theory.

20      As is the case here, in reviewing sufficiency of evidence claims, California courts expressly

21  follow the Jackson standard enunciated in Jackson v. Virginia, 443 U.S. 307 (1979). See People v.

22  Johnson, 26 Cal.3d 557, 575-578 (1980); see also People v. Thomas, 2 Cal.4th 489, 513 (1992).

23  Pursuant to the Supreme Court's holding in Jackson, the test in determining whether a factual

24  finding is fairly supported by the record is as follows:

25          "[W]hether, after viewing the evidence in the light most favorable to the
    prosecution, any rational trier of fact could have found the essential elements
26  of the crime beyond a reasonable doubt."

27

28      [6]People v. Johnson, 26 Cal.3d 557, 578 (1980).

1    Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

2          Sufficiency claims are judged by the elements defined by state law.  Jackson, 443 U.S. at 324

3    n. 16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C.

4    § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).  This presumption of correctness

5    applies to state appellate determinations of fact as well as those of the state trial courts.  Tinsley v.

6    Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to

7    state court determinations of legal questions or mixed questions of law and fact, the facts as found by

8    the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455

9    U.S. 539, 597 (1981).

10         As discussed above, the 5th DCA found substantial evidence that Petitioner and his co-

11   defendant had committed the provocative life-threatening act of firing a weapon into room 4.  The 5th

12   DCA's conclusion is not unreasonable. Aaron Gooden testified that Petitioner "always carried his

13   gun with him." (RT[7] 1193.) Gooden testified that "nine times out of ten," Petitioner carried a gun, be

14   it on his person or in his car. (RT 1194.) He further testified that co-defendant Taylor was carrying a

15   gun on the night of the murder. (RT 1194-95.) G Bob Smith stated to Detective Adair that he saw

16   Petitioner pull out a gun as he approached room 4. (RT 1130, 1628-29.) Kendall McDaniel testified

17   that when he opened the door to leave he immediately saw "silver guns" and "gun flashes." (RT

18   472.) The jury heard evidence that Shavon Smith, an occupant of room 4 during the shooting, had

19   told police "Tramell [Taylor] definitely shot Pookie [McDaniel]." (RT 993.) Shavon Smith testified

20   that he saw one person come into the room shooting, then a second shooter followed him in. (RT

21   791-92.) Evidence was presented to the jury that the shooters wore dark clothing; Petitioner and

22   Taylor wore a dark hooded sweatshirt that night and McCoy wore a gray-colored sweatshirt and

23   white t-shirt. (RT 497, 1712-13, 1894-97, 2216-17.)

24         In light of the evidence, it is clear the jury could have found that Petitioner was liable for the

25   death of McCoy under the provocative act murder theory. Moreover, Petitioner has failed to

26   demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application

27

28
          _____
          [7]"RT" refers to the Reporter's Transcript on Appeal lodged with the Court.

1  of, clearly established Federal law, as determined by the Supreme Court of the United States, or a

2  decision that was based on an unreasonable determination of the facts in light of the evidence

3  presented. See 28 U.S.C. § 2254(d). The claim must be denied.

4  **C.  Ground Three**

5      Petitioner next claims the trial court erred by failing to instruct on proximate cause as an

6  aspect of provocative act murder. Petitioner claims that this failure to instruct allowed the jury to

7  convict him without the jury finding he was the proximate cause of the victim's death.

8      <u>1. Background</u>

9      The jury was instructed with CALJIC No. 8.12 as follows:

10      A homicide committed during the commission of a crime by a person who is not a
    perpetrator of such crime, in response to an intentional provocative act by a perpetrator of the

11  crime other than the deceased [perpetrator], is considered in law to be an unlawful killing by
    the surviving perpetrator[s] of the crime.

12
        An intentional provocative act is defined as follows:

13      1. The act was intentional,
        2. The natural consequences of the act were dangerous to human life, and

14      3. The act was deliberately performed with knowledge of the danger to, and with
    conscious disregard for human life.

15
        In order to prove this crime, each of the following elements must be proved:

16      1. The crime of robbery [or] [attempted robbery] was committed;
        2. During the commission of the crime, a [surviving perpetrator] also committed an

17  intentional provocative act;
        3. [Another person not a perpetrator of the crime of robbery or attempted robbery] in

18  response to the provocative act, killed [a perpetrator of the crime];
        4. The [surviving perpetrator's] commission of the intentional provocative act was a

19  cause of the death of D. J. McCoy.

20      [Murder, which occurs during the commission or attempt to commit the crime of
    robbery, when there was in the mind of the perpetrator[s] of that crime, the specific intent to

21  commit robbery, is murder of the first degree.]

22      [Murder which is not of the first degree is murder of the second degree.]

23  (CT 1348-49.)

24      The use note for this instruction indicated that the term "cause" must be defined pursuant to

25  CALJIC Nos. 3.40 and 3.41. The jury was not given these instructions.

26      <u>2. Clearly Established Supreme Court Law</u>

27      As a preliminary matter, the court notes that an allegation that a jury instruction is incorrect

28  under state law does not form a basis for federal habeas corpus relief.  <u>Estelle v.  McGuire</u>, 502 U.S.

62, 67, 112 S.Ct. 475 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law."). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the instructions given the jury so infected the entire trial that the resulting conviction violates due process. Id. at 72, *citing* Cupp v. Naughten, 414 U.S. 141, 147 (1973). The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982), *citing* Henderson v, Kibbe, 431 U.S. 145, 154 (1977).  Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson, 431 U.S. at 154. "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Id.

            3. Review by State Courts

        As with the prior claims, this claim was first presented on direct appeal to the 5th DCA and denied on October 14, 2003, in a reasoned opinion. See Exhibit A, Answer. It was then presented to the California Supreme Court in a petition for review which was denied on January 22, 2004. See Exhibit B, Answer.  The California Supreme Court is presumed to have denied the claim presented for the same reasons stated in the opinion of the 5th DCA.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

        In reviewing Petitioner's claim, the 5th DCA first assumed the trial court erred in failing to give causation instructions. Nevertheless, the appellate court found no prejudice resulting from the error. The appellate court noted that the jury was twice informed that the homicide must be committed "in response" to the provocative act. Thus, Petitioner's argument that the jury could have found the murder was committed during a situation of mutual combat was nullified by these

1   instructions. In addition, Petitioner's argument that the jury could have found his participation was

2   merely verbal was without merit, because the instructions required the jury to find the intentional

3   provocative act to be life threatening, and a verbal communication does not meet this definition.

4       4. Analysis

5       Respondent's arguments are persuasive in this matter. Petitioner did not object to the

6   provocative act theory as given to the jury, nor did he call the omission to the attention of the judge.

7   "It is the rare case in which an improper instruction will justify reversal of a criminal conviction

8   when no objection has been made in the trial court." Henderson, 431 U.S. at 154. As stated by the

9   Supreme Court, "orderly procedure requires that the respective adversaries' views as to how the jury

10  should be instructed be presented to the trial judge in time to enable him to deliver an accurate

11  charge and to minimize the risk of committing reversible error." Id.

12      Moreover, Petitioner has not demonstrated that the claimed error resulted in a violation of his

13  constitutional rights. As noted by the appellate court, the instructions informed the jury that they

14  could only find Petitioner guilty of murder if the homicide had been committed "*in response* to an

15  intentional provocative act by a perpetrator." (CT 1348.) (emphasis added.) Thus, the jury

16  necessarily did not find this to be a mutual combat situation, because the jury found that the

17  homicide occurred after the defendants committed the robbery or attempted robbery and after the

18  occupants of room 4 returned fire "in response" to Petitioner's intentional provocative act.

19  Therefore, the lack of a causation language did not prejudice Petitioner.

20      Furthermore, Petitioner has not shown that the error had a substantial and injurious effect on

21  the verdict, because there is no likelihood that causation instructions would have altered the verdict.

22  Brecht v. Abrahamson, 507 U.S. at 637. The state court rejection of this claim was not contrary to, or

23  an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

24  of the United States, nor was the decision based on an unreasonable determination of the facts in

25  light of the evidence presented. See 28 U.S.C. § 2254(d). It must be denied.

26  **D. Ground Four**

27      Petitioner next claims that under state statute the robbery special circumstance could only be

28  applied to felony murder and was inapplicable to provocative act murder. He alleges he was

1    wrongfully given a term of life without the possibility of parole on this basis.

2            The Court finds this claim to be without merit. As correctly argued by Respondent, the

3    instant claim does not allege a violation of the Constitution or federal law. The claim is entirely

4    based on interpretation of a state statute, and generally, issues of state law are not cognizable on

5    federal habeas. Estelle v. McGuire, 502 U.S. 62, 67, (1991) ("We have stated many times that

6    'federal habeas corpus relief does not lie for errors of state law.' "), quoting Lewis v. Jeffers, 497 U.S.

7    764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere

8    error of state law, one that does not rise to the level of a constitutional violation, may not be

9    corrected on federal habeas").

10           Moreover, the appellate court ruled that the special circumstance allegation used in this case

11   was entirely correct under state law. Federal courts are bound by state court rulings on questions of

12   state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), cert. denied, 493 U.S. 942

13   (1989). State courts are "the ultimate expositors of state law," and this court is "bound by the state's

14   construction except when it appears that its interpretation is an obvious subterfuge to evade the

15   consideration of a federal issue." Peltier v. Wright, 15 F.3d 860, 862 (1994), quoting Mullaney v.

16   Wilbur, 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (construing state court judgment).

17   See also Melugin v. Hames, 38 F.3d 1478, 1482 (9th Cir.1994) (construing state criminal statute).

18   There is no evidence of subterfuge here.

19           A "claim of error based upon a right not specifically guaranteed by the Constitution may

20   nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial

21   that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658

22   F.2d 667, 673 (9th Cir.1981), citing Quigg v. Crist, 616 F.2d 1107 (9th Cir.1980); see also Lisenba

23   v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941); Henry v. Kernan, 197 F.3d

24   1021, 1031 (9th Cir.1999). In order to raise such a claim in a federal habeas corpus petition, the

25   "error alleged must have resulted in a complete miscarriage of justice." Hill v. United States, 368

26   U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962). The Court finds no such error here.

27           **E. Ground Five**

28           Petitioner next contends his due process rights were violated by the photographic

1  identification procedures used with respect to witness G Bob Smith. He claims the identification was

2  the result of an impermissibly suggestive police procedure.

3      1. Factual Background

4      The circumstances surrounding the photographic identification were summarized by the 5th

5  DCA in its opinion dated October 14, 2003, as follows:

6          Detective Adair questioned G Bob at the police department on December 7, 2000. At
        the time of the interview, there was no question in the officer's mind that Taylor and
7        [Petitioner] had been in G Bob's room at the Desert Star with McCoy prior to the time
        McCoy was shot. G Bob stated that the officers had not made any promises to him or
8        threatened him and that he would give his statement of his own free will. G Bob told
        Detective Adair that he knew McCoy and saw him in the parking lot of the motel with two
9        individuals before the shooting. He invited them into his room thinking that they were selling
        rock cocaine. When he found out they did not have drugs to sell, he left with them, walking
10       towards room 4. He saw one of the individuals, not McCoy, pull out a gun. Shots were fired
        and G Bob fled. Detective Adair showed G Bob two photographs, one of [Petitioner] and one
11       of Taylor. The photographs had the names of the defendants printed on them. Detective Adair
        asked G Bob if either person in the photographs looked like the person who pulled out the
12       firearm. G Bob pointed to the photograph of [Petitioner].

13          Defendant Taylor filed a pretrial motion in limine to suppress several pretrial
        identifications including the identification by G Bob of [Petitioner] as the person who pulled
14       out a gun prior to the shooting. [Petitioner] joined in the motion.

15          Detective Adair testified at the in limine hearing as set forth above. G Bob then
        testified that Detective Adair showed him the photographs, but he did not recognize either
16       individual. He knew Taylor's and [Petitioner's] names because Detective Adair had said
        them to him; in addition, the photographs had names under them. He identified [Petitioner]
17       because Detective Adair led him to believe that he could be prosecuted for the crime and he
        feared being prosecuted for the crime. G Bob testified that Detective Adair pointed to the
18       photograph he wanted G Bob to identify.

19          The trial court denied the motion, finding that the pretrial identification was not
        unduly suggestive.

20  See Exhibit A, Answer.

21      2. Clearly Established Supreme Court Law

22      "Suggestive confrontations are disapproved because they increase the likelihood of

23  misidentification, and unnecessarily suggestive ones are condemned for the further reason that the

24  increased chance of misidentification is gratuitous." Neil v. Biggers, 409 U.S. 188, 198, (1972).  In

25  Simmons v. United States, 390 U.S. 377, 384 (1968), the Supreme Court set forth the test for

26  determining whether the circumstances surrounding an identification are so suggestive as to violate

27  the Confrontation Clause of the Constitution:

28

1    (W)e hold that each case must be considered on its own facts, and that convictions based on
2    eye-witness identification at trial following a pretrial identification by photograph will be set
     aside on that ground only if the photographic identification procedure was so impermissibly
3    suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

In Stovall v. Denno, 388 U.S. 293, 301-302 (1967), the Supreme Court held that the defendant could

claim that "the confrontation conducted . . . was so unnecessarily suggestive and conductive to

irreparable mistaken identification that he was denied due process of law."

       3.  Review by the State Courts

       This claim was also first presented on direct appeal to the 5th DCA and denied in a reasoned

opinion. The California Supreme Court subsequently denied the claim without comment and is

presumed to have denied the claim presented for the same reasons stated in the opinion of the 5th

DCA. Ylst, 501 U.S. at 803.

       The appellate court first noted that the trial court and the parties approached the matter in

terms of a suggestive identification procedures. However, the issue was not one of identification. It

was not Smith's identification of the defendants at the motel that was in question; it was Smith's

account of what occurred at the event. Therefore, the issue involved a question of the admission of

inconsistent statements. At trial, Smith testified that he did not see Petitioner, Taylor or McCoy in

possession of weapons or masks prior to the shooting. He also testified that he did not remember

telling Detective Adair, but he remembered that he was scared and would have told the detective

anything due to the fact that the detective had told him he was a suspect and could be charged with

conspiracy. Thus, Smith's testimony at trial directly contradicted his statement to Detective Adair.

The appellate court ruled that Smith's statement to Detective Adair was properly admitted as a prior

inconsistent statement under Cal. Evidence Code §§ 770, 1235.

       4. Analysis

       The state court rejection of this claim was not unreasonable. As discussed by the court, the

suggestive identification procedures employed by the detective were not at issue because they did not

prejudice Petitioner. Specifically, the procedures did not taint the witness. His testimony at trial

directly contradicted his statement made to Detective Adair. In addition, the witness provided his

own version of the what he had said and why he had said it. The jury was fully informed of the

1   circumstances surrounding his statements. The jury was also presented with Detective Adair's

2   version of the events which was properly admitted under the prior inconsistent statement exception

3   to the hearsay rule. Thus, the jury was presented with both versions and could view the witnesses'

4   demeanor and judge their truthfulness. As Respondent points out, Smith was a very favorable

5   witness for the defense.

6           Therefore, the Court does not find any violation of Petitioner's due process rights. As the

7   state court rejection of this claim was not contrary to, or an unreasonable application of, clearly

8   established Federal law, as determined by the Supreme Court of the United States, nor was the

9   decision based on an unreasonable determination of the facts in light of the evidence presented, the

10  claim must be denied. See 28 U.S.C. § 2254(d).

11          F. Ground Six

12          In his final ground for relief, Petitioner alleges that conspiracy does not exist as an

13  independent theory of criminal liability for murder in California. He argues that the trial court erred

14  in its instructions because Petitioner could have been convicted of murder under a conspiracy theory

15  rather than under the two theories offered to the jury, to wit, felony murder and provocative act

16  murder.

17          The appellate court reviewed this claim and rejected it stating that it failed to see how

18  Petitioner could have been found guilty of murder under an alternative basis of conspiracy. The

19  appellate court noted that the murder instructions only provided the two theories of felony murder

20  and provocative act murder to support a first degree murder conviction. Conspiracy was never

21  discussed in the murder instructions. Petitioner does not point to any confusion on the part of the

22  jury, and the jury is presumed to follow its instructions. Richardson v. Marsh, 481 U.S. 200, 211

23  (1987). Petitioner has not shown that the instructions given the jury so infected the entire trial that

24  the resulting conviction violates due process. Estelle, 502 U.S. at 72.

25          Petitioner has failed to demonstrate that the state court rejection of his claim was contrary to,

26  or an unreasonable application of, clearly established Federal law, as determined by the Supreme

27  Court of the United States, or a decision that was based on an unreasonable determination of the

28  facts in light of the evidence presented. See 28 U.S.C. § 2254(d). This claim must be denied.

U.S. District Court
E. D. California          cd

1

**ORDER**

2

  Accordingly, IT IS HEREBY ORDERED:

3

  1. The petition for writ of habeas corpus is DENIED; and

4

  2. The Clerk of Court is DIRECTED to enter judgment for Respondent.

5

IT IS SO ORDERED.

6

**Dated: April 25, 2006**     **/s/ Lawrence J. O'Neill**
b9ed48        UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28